## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Keith L. Thomas, et al.,

                    Plaintiffs,            Case No. 16-CV-11447

v.                                         Judith E. Levy
                                           United States District Judge

International Union, United
Automobile, Aerospace And                  Mag. Judge R. Steven Whalen
Agricultural Implement Workers
Of America, et al.,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [31] AND GRANTING MOTION TO WITHDRAW AS COUNSEL FOR PLAINTIFFS KEITH L. THOMAS, SHARIF A. JEFFFRIES, AND JUAN BOYD [42]

This is a case of alleged retaliation and race discrimination against plaintiffs' union. Plaintiffs' employer Severstal Dearborn, LLC (the "company") terminated plaintiffs for "time theft." Plaintiffs filed Equal Employment Opportunity Commission ("EEOC") and the Michigan Department of Civil Rights ("MDCR") race discrimination claims against Severstal. Plaintiffs' union, defendants International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America, and UAW Local 600 ("the union"), began the grievance process, and ultimately negotiated a settlement that provided for plaintiffs to be reinstated and receive back pay. The settlement also contained a waiver clause that would have required plaintiffs to withdraw any and all pending claims against Severstal in connection with the plaintiffs' termination, other than claims, complaints, or causes of action not waivable by law. Plaintiffs interpreted this waiver clause as a requirement that they drop their then-pending EEOC and MDCR claims. Plaintiffs declined the settlement offer and they were not reinstated. Plaintiffs bring this suit against the union for retaliation and race discrimination under Title VII (42 U.S.C. §2000e-3(a)) ("Title VII"), Section 1981 (42 U.S.C. §1981) ("Section 1981"), and the Michigan Elliott-Larsen Civil Rights Act (M.C.L. §37.2101) ("ELCRA").

Defendants make three arguments in their motion for summary judgment: (1) plaintiffs have demonstrated no evidence of race discrimination or retaliation (2) plaintiffs' case is preempted by section 301 of the Fair Labor Relations Act and should be dismissed because (a) it is time barred, and (b) because plaintiffs failed to exhaust the grievance procedure; and (3) plaintiffs cannot establish liability under

the anti-discrimination statues against defendants, because defendants did not breach the duty of fair representation or act with racial animus against them. (Dkt. 31.)

Because plaintiffs have not come forward with evidence of retaliation or race discrimination, defendants' motion for summary judgment must be granted, and the Court need not analyze defendants' remaining arguments.[1]

## I. Background

In 2013, plaintiffs worked at the company in the scarfing department. (Dkt. 20 at 6-7.) Employees entered the company's facility by using a "gate swipe" system. (Dkt. 31-22 at 11.) The gate swipe recorded the time employees entered the company grounds, but did not record the time employees left company grounds. (*Id*.)

In early 2013, the company became aware that scarfing department and slab yard department employees were re-entering company grounds at various times during their shift without ever clocking out or requesting leave. (Dkts. 31-22 at 11, 20 at 6.) The company conducted an investigation of possible time theft by analyzing

---

[1] Pursuant to E. D. Mich. L.R. 7(f)(2), there will be no oral argument on this matter.

several months of gate swipe records for all employees in the scarfing and slab yard departments. (Dkts. 31-22 at 11, 31-9 at 6, 23.)

The company found that the practice of re-entering company grounds during a shift was widespread, and included nearly all employees in the scarfing and slab yard departments. (Dkts. 31-22 at 12, 20 at 6-7). The company found that all 17 of 17 scarfing employees and 32 of 33 slab yard employees swiped into the facility during their shifts. (Dkts. 20 at 6-7, 31-9 at 7-8.)

The company's policy regarding time theft is to terminate the employee. (Dkt. 31-9 at 7.) However, the company recognized that if it terminated all employees for the time theft violations, it would result in a mass firing. (*Id*.) This would leave the company without any trained employees in the scarfing department and only one in the slab yard department, and could result in a shutdown of the operations. (Dkts. 31-9 at 8, 31-22 at 12.)

The company determined that it had a business interest to limit the discipline of the time theft violators to avoid a shutdown. (Dkts. 31-9 at 8, 31-22 at 12.) The company compared the swipe-ins to clock-outs, and determined that re-entry swipe-ins within one hour (and in some

cases within minutes) of the end of the employee's shifts were, in the company's opinion, more egregious than swipe-ins in the middle of a shift. (Dkt. 31-9 at 6). Annette Gibbons, manager of labor relations at the company, stated in her deposition:

> [W]e made a recommendation based on different criteria. We looked at the frequency, of course. And we also looked at when those individuals were shown coming back into the plant. So we looked at individuals who were coming in just before they were supposed to clock out at the time clocks for the end of the day where we believed those individuals had been gone for an extended period of time and were coming back only to clock out. And my determination was that those employees were gone for long periods of time as opposed to those employees who it appears left through the lunch hour and were gone to pick up lunch or something and returned. So the penalty was based—was more severe for those who we determined had been gone for a longer period of time. (Dkt. 31-22 at 12.)

The company terminated all employees whose swipe-ins were within an hour of clocking out at least 30% of the time. Plaintiffs were all in this group of terminated employees. (Dkt. 20 at 7.) Plaintiffs Jeffries, Boyd, and Thomas were terminated on May 14, 2013, June 13, 2013, August 6, 2013, respectively. (Dkts. 31-4 at 2, 31-3 at 2, and 31-5 at 2.)

Thirteen out of the seventeen scarfing department employees were African American in 2013, including plaintiffs. (Dkt. 36-6 at 2.) In the

scarfing department, six out of the seven terminated employees were African American. (Dkt. 20-1.)

On June 20, 2013, plaintiff Jeffries filed an MDCR/EEOC race discrimination charge against the company arising out of his discharge. He alleged that similarly situated white employees were not discharged. (Dkt. 36-8.) On June 21, 2013, plaintiff Boyd filed virtually identical charges with the MDCR and EEOC. (Dkt. 36-9.) On August 30, 2013, plaintiff Thomas filed charges with the EEOC and MDCR, but unlike Jeffries and Boyd, Thomas also alleged national origin discrimination in his charge. (Dkt. 36-10.)

The plaintiffs' grievance procedure began at stage two.[2] (Dkt. 31-3, 31-4, 31-5). Plaintiffs Jeffries, Boyd, and Thomas' stage two grievances were filed on May 14, 2013, June 13, 2013, and August 6, 2013, respectively. (Dkts. 31-4 at 2, 31-3 at 2, 31-5 at 2.)

All three plaintiffs' stage two written statements of the case were identical. They all argued that (1) the penalty for theft of time was unfounded and unjust, (2) the alleged swipe-in violations had been

---

[2] The collective bargaining agreement ("CBA") provides that, for disciplinary cases such as this, "any grievance protesting such action [the discharge] shall be initiated at the Second Stage of the Grievance Procedure." (Dkt. 31-2 at 14.) Thus, grievances were properly initiated at this stage.

taking place consistently and routinely in the department, including by management, and (3) the plaintiffs were sandbagged by the sudden penalties. (*Id.*) None of the plaintiffs' stage two grievances mentioned race discrimination. (*Id.*) However, plaintiff Thomas wrote a letter to his union president, William Wilhelm, before his stage two grievance was filed, and stated that "[t]he company has disproportionally applied discipline to African American employees." (Dkt. 31-7 at 3).[3] Boyd, Jeffries, and Thomas' grievances were denied on July 3, 2013, July 9, 2013, and August 7, 2013, respectively (Dkts. 31-3, 31-4, 31-5.), with the company finding no violation of the CBA. (*Id.*)

Stage three of the grievance process is discretionary in that the CBA provides that the union president "may, if he or she considers the grievance to be well founded, carry it to the Third Stage." (Dkt. 31-2 at 12.) Notably, the third stage is the last opportunity for the union to add additional claims to a grievance. (Dkt. 31-2 at 12.) Specifically, the third stage requires that the written statement:

---

[3] Plaintiff Thomas' letter to Wilhelm is dated July 19, 2013. (Dkt. 31-7 at 3.) His stage two grievance was not filed until after the other plaintiffs' grievances on August 6, 2013. (Dkt 31-5.) Plaintiff Thomas was on medical leave until August 2013, and thus his termination and grievance procedure began after he returned to work from leave. (Dkt. 31-27 at 14.)

shall fix the nature of the grievance and of the issues for all subsequent consideration of the case in the Grievance Procedure (including the Fourth Stage), and if either party shall attempt to deviate materially from the contents of such statement after furnishing it to the other party, the grievance shall be remanded to the Second Stage for reconsideration unless the other party agrees otherwise. (Dkt. 31-2 at 12.)

If a race discrimination claim is included in a third stage grievance, the union president has the discretion to refer the grievance to the chairperson of the local union's civil rights committee for an investigation and report. (Dkt. 31-2 at 12.)

Under the CBA, the union representative also has the discretion and authority to settle cases on behalf of the union:

The Regional Director or his or her designated representative shall have the power to settle or withdraw on behalf of the Union any case or cases appealed to his or her level of the procedure, either before or after the Third Stage disposition by the Company is received, that in his or her judgment does not merit appeal to the next step. (Dkt. 31-2 at 13.)

On July 12, 2013, plaintiff Jeffries wrote a letter to his union president, William Wilhelm, stating that he was "specifically alleging race discrimination in my suspension grievance and my termination grievance." (Dkt. 36-2 at 14.) On August 11, 2013, he emailed Wilhelm, stating that he wanted to be "assured that the alleged racial

discrimination would not only be included in my file but presented to the company from the union as our position in these grievances." (Dkt. 31-10 at 2.)

On August 12, 2013, plaintiff Boyd wrote a letter to Wilhelm, stating, "[t]he employer engaged in illegal behavior which resulted in African Americans being discharged disproportionally." (Dkt. 31-8 at 2.) He further stated that he felt the employer was "stalling and refusing to move forward on our grievance… and is further retaliating against us for exercising constitutional rights." (*Id.*)

Wilhelm testified in his deposition that he had conversations with the company regarding plaintiffs' race discrimination arguments. "Concerns of discrimination were raised during a third stage interview where I was in attendance…" (Dkt. 31-28 at 7.) However, after his discussions with the company, he was not convinced that the company was motivated by race when it discharged plaintiffs. (Dkt. 31-28 at 7.) Specifically, Wilhelm stated: "I mean, I think I lacked evidence [of race discrimination.] I lacked facts. I don't think the—I personally was trying to advocate for the members at all costs. But to make a claim like that, I think convoluted the process without evidence." (*Id.*)

Wilhelm, in his discretion, referred the plaintiffs' grievances to representative Jimmie Williams. (Dkt. 33.) Williams' main argument in the stage three grievance hearing was that there was no just cause for termination. (Dkt. 33 at 4.) However, Williams also discussed the plaintiffs' race discrimination claims in his meetings with the company. (Dkt. 33 at 4.) Williams' affidavit states that he discussed the allegations of race discrimination with Gibbons when they met. Gibbons explained the tiered system of punishment based on gate swipe data. (*Id.*) In light of Gibbons' explanation and gate-swipe documentation, Williams was "not convinced that the grievance should be re-written to include the discrimination claims because the chances of prevailing at arbitration on that issue were not very good." (*Id.*)

In October of 2013, Williams negotiated a settlement (the "October 2013 proposed settlement") with the company where each of the terminated employees would serve a 120-day suspension, receive 40-hours per week of back pay, and be reinstated into different jobs. (Dkt. 33 at 4-5.) The October 2013 proposed settlement also contained language requiring the terminated employee to withdraw pending charges and agree not to file complaints arising out of his discharge

with the EEOC, MDCR, the National Labor Relations Board ("NLRB"), or any other agency. (*Id*.) Specifically, the October 2013 proposed settlement contained the following paragraph:

> Grievant agrees to request the withdrawal of any pending charges or complaints filed and agrees not to file, or authorize the filing in his name or on his behalf, of any additional charges or complaints arising out of his discharge or this grievance processing and settlement with the Equal Employment Opportunity Commission, the Michigan Department of Civil Rights, the National Labor Relations Board or any other administrative agency; and agrees that no monetary or other relief may be awarded to Grievant or for Grievant's benefit as a result of any administrative proceeding of such charge or complaint. (Dkts. 31-12 at 2, 36-2 at 7, 36-4 at 7.)

Some of the terminated employees who are not parties to this case accepted the October 2013 proposed settlement, however, plaintiffs all rejected it. (Dkts. 31-12 at 2-5, 36-2 at 7-13, 36-4 at 7-8) Plaintiffs Jeffries and Thomas testified in their depositions that they rejected the October 2013 proposed settlement in part because of the waiver provision. (Dkts. 31-24 at 13, 31-27 at 88-91.) Williams then passed the plaintiffs' grievances on to the next step in the grievance process. (Dkt. 31 at 17.)

Under the CBA, in the union's discretion, an unresolved grievance may be appealed by the union's national Ford department to an

arbitrator if it has not been satisfactorily resolved by the conclusion of the first three steps of the grievance procedure. (Dkt. 31-2 at 15.) Arbitrator's decisions are final and binding on the union and its members, as well as the company. (Dkt. 31-2 at 18.) The defendants' national Ford department has the authority to withdraw a grievance or settle one at any time before the case is heard by the arbitrator. (Dkt. 31-2 at 16.)

In July 2014, Reginald Ransom, who was then the Assistant Director for defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("International Union"), attempted to settle with the company before the case was arbitrated. (Dkt. 31 at 17.) Ransom negotiated a new resolution of the grievances, which included a removal of suspension, reinstatement into a new position within the company, an increased back pay offer, and other non-monetary conditions (the "July 2014 proposed settlement"). (Dkts. 36-20 at 2, 15, 36-19 at 2, 3, 36-18 at 2-3.) The July 2014 proposed settlement also contained a waiver of claims clause, but it differed from the October 2013 proposed settlement in

that it did not require a waiver of claims that are "not waivable by law."

(*Id*.) Specifically, the July 2014 proposed settlement stated:

> I hereby agree to withdraw any and all pending claims, complaints, or causes of action, and not file any new claims, complaints, or causes of action against Severstal North America in connection with the events that led up to me being subject to this Reinstatement Employment Waiver… *other than claims, complaints, or causes of action not waivable by law*. (Dkts. 36-20 at 15, 36-19 at 3, 36-18 at 3) (emphasis added.)

In Ransom's opinion, the July 2014 proposed settlement would not have required plaintiffs to drop their EEOC and MDCR claims. Ransom's email to Gibbons on July 9, 2014 states, "the Union wishes to emphasize that there is no agreement with the UAW to prohibit or revoke each Grievant's right to file claims or pursue existing claims with an agency outside of the collective bargaining agreement." (Dkt. 31-15 at 2.) Gibbons testified in her deposition that this was the company's position as well. With respect to the July 2014 proposed settlement's waiver provision, "My discussion with Reggie [Ransom] would have been similar to what I have said. That whatever was not waivable by law we would not object. That was our discussion." (Dkt. 31-22 at 6-7.)

Further, plaintiff Thomas testified that Ransom advised him he could continue to pursue discrimination claims with the EEOC and MDCR, when he stated: "Oh, yes, that's what he told us, that we would be able to pursue outside charges." (Dkt. 31-27 at 94-95.) He also testified, "[h]e [Ransom] just told me that the settlement had been—I mean, that the grievance had been settled and we could return to work and we didn't have to sign off on the outside charges." (Dkt. 31-27 at 57.) Plaintiffs nonetheless rejected the July 2014 proposed settlement. (Dkt. 31 at 18.)

On July 30, 2014, plaintiff Boyd attempted to appeal the settlement of his grievance through the International Union's appeal process. (Dkt. 31-17.) Plaintiffs Jeffries and Thomas did not seek to appeal their grievances any further. (Dkt. 31-18 at 4.) Plaintiff Boyd's position was that he was not consulted on the terms of the July 2014 proposed settlement before it was reached. (Dkt. 31-17 at 8-9.) He also alleged that the waiver portion of the July 2014 proposed settlement constituted coercion in that it would restrain him from exercising his rights to pursue claims against the company outside of the grievance process. (*Id*. at 9.) Plaintiff Boyd sought to have the settlement

overturned and to reinstate the grievance so that he could proceed to arbitration. (Dkt. 31-17 at 23.)

Plaintiff Boyd's appeal was denied on the basis that Ransom's decision to settle the grievance was "not devoid of a rational basis." (Dkt. 31-17 at 24.) Further, the International Union found "no evidence that collusion with management, discrimination, or fraud improperly motivated the decision." (Dkt. 31-17 at 24.) Plaintiff Boyd did not further appeal his grievance.

On January 22, 2016, the EEOC mailed Jeffries and Thomas a Dismissal and Notice of Right to Sue. (Dkt. 31-16 at 2, 3.) The EEOC rejected Jeffries' and Thomas' charges for the reason that it was unable to conclude that the information obtained established a violation of statute. (*Id.*) Boyd did not receive a right to sue letter. (Dkt. 20 at 5.)

This case was filed on April 21, 2016. (Dkt. 20 at 33-37.) Plaintiffs allege that defendants violated Title VII, Section 1981, and the ELCRA because (1) the July 2014 proposed settlement constituted discriminatory retaliation in that it required plaintiffs to waive their pending EEOC and MDCR claims against the company in order to be reinstated; and (2) the defendants intentionally followed a policy of

failing to pursue grievances that included allegations of race discrimination. (Dkt. 37 at 29-33.)

## II. Legal Standard

### a. Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x. 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

### b. Title VII, Section 1981, and the ELCRA

Title VII forbids an employer or union from retaliating against an employee on the basis of filing a charge of discrimination or participating in a hearing or proceeding, such as an EEOC or MDCR proceeding. 42 U.S.C. § 2000e-3(a) states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees... because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. (*Id.*)

Title VII also forbids an employer "to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

The ELCRA forbids similar conduct. (M.C.L. § 37.2202 (2018.)) The ELCRA resembles federal law, and the same evidentiary burdens prevail as in Title VII cases. *Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1263 (E.D. Mich. 2011). Further, Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to determine whether a claim has been established in a case brought under the ELCRA. *Radtke v. Everett*, 442 Mich. 368, 382 (1993) (quoting *Sumner v. Goodyear Co.*, 427 Mich. 505, 525 (1986)).

Finally, Section 1981 prohibits race discrimination in the making and enforcing of private contracts. *See* 42 U.S.C. § 1981. "The elements of [a] prima facie case as well as the allocations of the burden of proof

are the same for employment claims stemming from Title VII and § 1981." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n. 5 (6th Cir. 2000) (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). Additionally, Section 1981 encompasses retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008). Consequently, all three alleged statutory violations will be analyzed under the same framework.

Once plaintiffs establish a *prima facie* case, defendants may offer any legitimate, non-discriminatory reason for the action. *Alexander v. Local 496, Laborers' Intern. Union of North America*, 177 F.3d 394, 403 (6th Cir. 1999.) Once defendant has done so, plaintiffs may then rebut the purported reason with evidence showing that it is a pretext for retaliation or discrimination. *Id*. However, the burden of proof at all times remains with the plaintiffs. *Id*.

Title VII cases may be directed at both employers and labor organizations. *See Peeples v. City of Detroit*, No. 17-1222, 2018 WL 2451933 at *6 (6th Cir. June 1, 2018). ELCRA actions against unions are also permissible. *See e.g. Bondurant v. Air Line Pilots Ass'n*, 718 F. Supp. 2d. 836 (2010). While Section 1981 claims are more commonly

brought against employers, they may also be brought against labor unions. *See Reeves v. Int'l Union, United Auto.*, 2017 WL 193547 at *3 (E.D. Mich. January 18, 2017).

## III. Evidence of Retaliation

Defendants argue that plaintiffs have not demonstrated any evidence of retaliation. Plaintiffs' argue that the July 2014 proposed settlement's waiver clause constituted evidence of retaliation. The Court agrees with defendants.

To establish a *prima facie* case of retaliation, plaintiffs must show that "(1) [they] engaged in activity protected by Title VII [Section 1981 or the ELCRA]; (2) this exercise of protected rights was known to [the defendants]; (3) [the defendants] thereafter took adverse employment action against [the plaintiffs]; and (4) there was a causal connection between the protected activity and the adverse employment action." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006); *Ford v. General Motors Corp.*, 305 F.3d 545, 552–53 (6th Cir. 2002).

Neither party clearly sets forth the standard they believe the Court should apply to the retaliation count. It would appear that

neither party disputes that plaintiffs engaged in a "protected activity" when they filed EEOC and MDCR claims for race discrimination. Neither party disputes that defendants knew about plaintiffs' EEOC and MDCR charges. Thus, the remaining issues are whether the defendants' offer of the July 2014 proposed settlement could have constituted an adverse action, and whether there is a causal connection between the alleged adverse action and the protected activity. For the reasons set forth below, the July 2014 proposed settlement does not constitute an adverse action against plaintiffs. The Court need not analyze whether there is a causal connection since it does not find an adverse action.

The Sixth Circuit has held that settlement agreements requiring a terminated employee to waive all claims with outside agencies (a so-called charge-filing ban) before receiving a benefit they are not otherwise entitled to does not constitute evidence of unlawful retaliation. In *EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490 (6th Cir. 2006) SunDance, an employer, terminated Salsbury, one of its employees. *Id*. at 492. After her employment ended, Salsbury filed a charge of sex discrimination with the EEOC. *Id*. at 494. SunDance

offered Salsbury severance pay if she signed a separation agreement and release that included a charge-filing ban. *Id*. at 492. Salsbury wanted the severance, but refused to sign the separation agreement. *Id*. at 494. The EEOC dismissed her sex discrimination claim. *Id*. at 494. Salsbury then filed a second charge with the EEOC alleging that SunDance retaliated against her by refusing her severance unless she agreed to the charge-filing ban. *Id*.

The EEOC, after investigating Salsbury's claims, filed suit against SunDance under Title VII, claiming that the separation agreement's charge-filing ban was a violation of Title VII. The EEOC argued that the Sixth Circuit looks at an employer's prohibition on filing discrimination charges with disfavor, since it could have a chilling effect on employees informing the EEOC of possible discrimination. *Id*. at 498; *see EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.2d 448, 456 (6th Cir. 1999) ("courts have observed that an individual may not contract away her right to file a charge with the EEOC, as such contracts are void as against public policy.")

After evaluating the facts in the case, the Sixth Circuit held that SunDance's charge-filing ban offered to Salsbury, though it may be

unenforceable as against public policy, was not in and of itself retaliatory under Title VII. *Id.* at 501. The Sixth Circuit stated that "[t]his was not a benefit given or owed to all employees that was then withdrawn because of some protected conduct. As such Salsbury was not adversely affected, and on these facts the denial of severance pay was not an adverse action for the purposes of the retaliation analysis." *Id.*

The Sixth Circuit emphasized that Salsbury's choice whether to sign the separation agreement and receive a severance payment was voluntary. *Id.* at 501. Additionally, those who signed "had not been deprived of anything" and were "better off" because they received a benefit from SunDance. *Id.* Those who rejected the separation agreement "obviously [had] not give[n] up any rights." *Id.* The court went on to state that those who did not sign the severance agreement were "left… in the same position that [they] had been in before the offer of the free standing separation agreement." *Id.* at 502.

As set forth above, plaintiffs in this case filed post-termination EEOC claims. (Dkts. 36-8, 36-9, 36-10.) Similar to the employer in *SunDance*, defendants here did not give and then withdraw a benefit to

22

plaintiffs because of their EEOC claims. Plaintiffs have not shown any evidence that the July 2014 proposed settlement was anything other than a proposed resolution of their grievances arising out of their termination for time theft.

Just as in *SunDance*, plaintiffs' choice whether to sign the July 2014 proposed settlement was voluntary. If plaintiffs had signed it, they would have arguably been better off—they would have received a resolution of their grievances, which would include a removal of suspension, reinstatement into a new position with the company, back pay, and other non-monetary conditions. (Dkts. 36-20 at 2, 15, 36-19 at 2, 3, 36-18 at 2, 3.) But by rejecting the July 2014 proposed settlement, plaintiffs were "left… in the same position that [they] had been in before the offer of the free standing separation agreement." *SunDance*, *supra*, 466 F.3d at 502. For this reason, the mere fact that the defendants negotiated and offered the plaintiffs the July 2014 proposed settlement is not evidence of retaliation.

Additionally, in any event, the Court is persuaded that the company and defendants never intended for plaintiffs to drop their EEOC and MDCR claims under the July 2014 proposed settlement. The

July 2014 proposed settlement specifically excluded claims "not otherwise waivable by law" from the agreement. (Dkts. 36-20 at 2, 15, 36-19 at 2, 3, 36-18 at 2, 3.) As set forth above, Ransom's email to Gibbons on July 9, 2014 emphasized that the defendants' position was that, under this provision, the July 2014 proposed settlement did not require plaintiffs to revoke their existing claims, nor did it interfere with their right to pursue their claims. (Dkt. 31-15 at 2.) As set forth, Gibbons testified in her deposition that this was the company's position as well. (Dkt. 31-22 at 6-7.) Moreover, plaintiff Thomas testified that he understood this language to mean he could continue to pursue his MDCR and EEOC claims if he agreed to the July 2014 proposed settlement. (Dkt. 31-27 at 94-95.) In short, plaintiffs have not provided any evidence to raise a material question of fact regarding whether they would have been required to waive their pending EEOC and MDCR claims if they had accepted the July 2014 proposed settlement.

For these reasons, plaintiffs have not carried their evidentiary burden that the July 2014 proposed settlement constituted retaliation. They have not pointed to any evidence to show a causal connection between their then-pending EEOC and MDCR claims and the proffered

July 2014 settlement. Nor have plaintiffs shown any evidence that the July 2014 proposed settlement would have required them to waive their then-pending claims. Because plaintiffs have not met the evidentiary burden for a retaliation case under Title VII, Section 1981, or the ELCRA, defendant's motion for summary judgment is granted as to plaintiffs' retaliation claims.

## IV. Evidence of Discrimination

Defendants also argue that there is no issue of material fact as to plaintiffs' claim that the defendants discriminated against them based on race. (Dkt. 31-36.)

Here, plaintiffs are also required to show a *prima facie* case of discrimination, which requires the following:

> (1) [plaintiffs] were members of a protected class; (2) [plaintiffs] suffered adverse employment actions; (3) [plaintiffs] were qualified for their positions; and (4) [plaintiffs] were replaced by someone outside the protected class or were treated differently than similarly-situated, non-protected employees. *Peeples*, *supra*, at *6. (*citing DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

Neither party addresses the first three elements of this test in their briefs.[4] Defendants urge the Court to analyze whether they acted with racial animus, which they deny occurred. (Dkt. 31 at 31.)

The first element, that plaintiffs are all African American, is not disputed. (Dkt. 36-6 at 2.) The second element, that plaintiffs were subject to an adverse employment decision when they were terminated for time theft, is also not in dispute. Third, plaintiffs' qualifications for their employment with the company has not been challenged by either party. Therefore, the fourth element, whether plaintiffs were treated differently than similarly situated non-protected employees, is the key issue on summary judgment.

Plaintiffs insist that defendants did not include race discrimination in the grievance procedure, and therefore discriminated against them on the basis of their race. (*Id.* at 33-35.) This claim is not borne out by the facts. It appears to be true that the written grievance did not include race discrimination. (Dkt. 31-6 at 4.) However, as set forth above, union representatives and company representatives testified in depositions and affidavits that race discrimination was

---

[4] Indeed, neither party set forth the appropriate standard, or any other legal standards of analysis in their briefs.

considered during the grievance procedure. Wilhelm testified in his depositions that he had conversations with the company during the grievance process regarding plaintiffs' claims of race discrimination. (Dkt. 31-28 at 5-7.) Williams' affidavit states that he discussed the plaintiffs' race discrimination allegations with the company during the grievance process as well. (Dkt. 33 at 4.) Also, Gibbons confirmed that these discussions took place during many stages of her meetings with union representatives:

> Q: How many discussions would you say you had with the Union where they relayed these concerns [race discrimination]?

> A: I would say we had a lot. I mean, how many. I believe they raised those concerns as early as the second stage of the grievance process. And understand, we have a very, we have a very good relationship with the Union. So they don't have to make an appointment to come and see me. They can walk in my office and they would start a discussion about it. And it was ongoing because, of course, during my time, my labor reps were taking statements. So the discussions were just ongoing. (Dkt. 31-22 at 13.)

Plaintiffs have failed to point to any evidence that defendants refused to address their allegations of race discrimination.

The CBA gave defendants broad discretion in determining which grievance claims to pursue and whether to amend a grievance to include

claims of race discrimination. (Dkt 31-2 at 12, 13, 15.) The facts and evidence show defendants evaluated plaintiffs' race discrimination claims throughout the grievance process, but ultimately decided they lacked merit. Wilhelm testified that he thought the race discrimination claims "lacked evidence," "lacked facts," and "convoluted the process without evidence." (Dkt. 31-28 at 7.) Williams' affidavit states that, after evaluating the race discrimination claims, he felt the "chances of prevailing at arbitration on that issue were not very good." (Dkt. 33 at 4.) In sum, plaintiffs' argument that race discrimination was not pursued in the grievance process lacks merit. Rather, defendants pursued the claim long enough to determine that it should not be pursued further, and plaintiffs have not come forward with any evidence to show that this was a pretext for race discrimination.

Plaintiffs argue that evidence of race discrimination can be shown because similarly situated employees who signed a settlement agreement were reinstated. (Dkt. 36 at 23.) This argument lacks merit. Plaintiffs argue that five employees, all of whom were African American, signed the October 2013 proposed settlement. (Dkt. 36 at 23.)

They all dismissed their pending EEOC claims and were reinstated. (Dkts. 36 at 23; 36-11, 36-12, 26-13, 26-14, and 36-15.)

But, the October 2013 proposed settlement's waiver provision is different from the July 2014 proposed settlement offered to plaintiffs. (Dkts. 31-12 at 2, 31-13 at 4.) Specifically, the October 2013 proposed settlement required "withdrawal of any pending charges or complaints filed… with the Equal Employment Opportunity Commission, the Michigan Department of Civil Rights, the National Labor Relations Board, or any other administrative agency…" (Dkt. 31-12.) The July 2014 proposed settlement, which is the only relevant proposed settlement in this case, required "withdraw[al] of any and all pending claims… other than claims… not waivable by law." (Dkt. 31-13 at 4.) Whether other terminated employees accepted the October 2013 proposed settlement is irrelevant to whether plaintiffs in this case were discriminated against. Thus, plaintiffs' argument regarding the five African American employees who accepted the October 2013 proposed settlement cannot constitute evidence of race discrimination.

Finally, plaintiffs argue that the defendants had a pattern of failing to pursue race discrimination cases in grievances, and therefore

discriminated in this instance. (Dkt. 36 at 33.) Plaintiffs rely on *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), for the premise that a union "otherwise discriminates" when it intentionally avoids asserting race discrimination claims. *Id.* at 669. All that plaintiffs proffer in support of this argument is that none of the twenty-eight grievances processed from 2009-2017 alleged race discrimination. (Dkt. 37 at 36.) This fact alone does not raise a question of fact as to whether defendants had a pattern of failing to pursue race discrimination cases in general, much less whether defendants discriminated against plaintiffs in this case.

For all of these reasons, there is no material question of fact regarding whether defendants intentionally discriminated against plaintiffs on the basis of race, and defendants' motion for summary judgment is granted on this count as well.

## V.   Plaintiffs' Counsel's Motion to Withdraw as Counsel is Granted

On June 15, 2018, plaintiffs' counsel Steve Tomkowiak moved to withdraw as counsel in this case. Mr. Tomkowiak explained that he has accepted a new job and can no longer represent plaintiffs. Neither plaintiffs nor defendants oppose the motion. Accordingly, the motion to

withdraw (Dkt. 42) is granted, and plaintiffs will be given forty-five days to locate new counsel if they wish to appeal this decision.

## VI. Conclusion

For all of the reasons set forth above, defendants' motion for summary judgment (Dkt. 31) is GRANTED and plaintiffs' counsel's motion to withdraw (Dkt. 42) is GRANTED. In order to provide plaintiffs with adequate time to find substitute counsel, final judgment in this case will not be entered for sixty days after the date of this Order.

IT IS SO ORDERED.

Dated: June 28, 2018         s/Judith E. Levy
     Ann Arbor, Michigan      JUDITH E. LEVY
                         United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 28, 2018.

                       s/Shawna Burns
                       SHAWNA BURNS
                       Case Manager